## No. 6108.

### ADOLPHE GAIDRY VS. G. LYONS, SHERIFF, ET AL.

Property which a debtor has conveyed to another by a *simulated* sale may be seized by a creditor, in whatever hands it may be found. In such case no preliminary revocatory action is necessary.

The conversations, and admissions of one of the parties to an alleged fraud, or simulation, are admissible in evidence, even though they have occurred out of the presence of the other parties.

Where fraud or simulation is at issue, any act of one of the parties to it, bearing on the issue, is relevant. In such cases a large latitude in the admission of evidence is not merely permitted, but enjoined.

APPEAL from the Fifteenth Judicial District Court. *Beattie,* J. *N. H. Rightor* and *E. W. Blake,* for plaintiff and appellant. *Goode & Winder,* for defendants.

The opinion of the court was rendered by MANNING, C. J.

#### ON THE MOTION TO DISMISS.

The defendants and appellees move to dismiss this appeal on the grounds that there was no legal motion for an appeal made in the lower court, and no legal order of appeal granted.

The minutes of the court show that the motion was made in open court, and the order entered in form. The motion to dismiss is therefore refused.

#### ON THE MERITS.

This is an injunction obtained by plaintiff restraining the sheriff of the parish of Terrebonne, and Lapène & Ferré, judgment creditors of Theodule Duplantis, from selling certain sugar and molasses seized by the sheriff under a writ of *fieri facias* issued at the instance of those creditors.

The facts need to be detailed. On the sixteenth of February, 1870, Theodule Duplantis executed an act of mortgage to Lapène & Ferré to secure two notes of $5847 35 and $3500, in which his wife makes the usual renunciation. The property mortgaged is a sugar plantation composed of six tracts of land originally, each one of which is specifically described, with the engine, machinery, and buildings.

On the twenty-seventh of January, 1873, Lapène & Ferré instituted suit against Theodule Duplantis for $11,156 76, subject to a credit of $5774 32. This was on account, and it does not appear that either of the above notes was included in that suit.

Nine days after the filing of that suit, viz.: on February fifth following, Theodule Duplantis leased to his brother Marcel the six tracts of land described in the mortgage above recited, and sold him five other tracts. The lease was for three years, commencing with 1873, and the condition the payment of two thousand dollars per annum, for which notes were executed by Marcel.

On the sixteenth of May of the same year judgment was rendered in favor of Theodule Duplantis's wife against him for $2175, with interest from the above date, and recognizing a mortgage in her favor, dissolving the community, etc.

On the twenty-fourth of the same month Theodule Duplantis conveyed by notarial act to his wife the six tracts of land mortgaged to Lapène & Ferré in 1870, and leased to Marcel three months before for $3289 68, the wife paying by acknowledging satisfaction of her judgment, and assuming the payment of a mortgage note of her husband to one Barilleaux for $1111 98. Marcel witnessed the act.

On the twenty-ninth of November of the same year Lapène & Ferré obtained judgment in their suit against Theodule Duplantis for $2908 78 and interest.

On the twenty-second of December following Marcel Duplantis sublet to Adolphe Gaidry, the plaintiff, the property purchased by him from Theodule the previous February, and also the six tracts leased by him from his brother in the same act, which are the same tracts that his brother had sold to his wife in May, to which sale Marcel was a witness. This lease was for 1874 only, and the price was eight hundred dollars, to be paid early in the year.

It was not until the first of December, 1874, that execution was issued by Lapène & Ferré on their judgment, and four days thereafter Gaidry enjoined further proceedings, upon the ground that the property seized belonged to him, having been produced on the plantation of which he was lessee, and which was cultivated by him, and of which he was in possession at the time of seizure, both of plantation and produce.

The defendants, Lapène & Ferré, deny this, and aver that their debtor,

Theodule Duplantis, was in possession of the plantation that year, and had been for thirteen years continuously, and was also in possession of the produce seized; that the lease of the plaintiff from Marcel Duplantis, as well as that of Marcel from their debtor, was a "sham and a myth," and the whole transactions of these parties were simulations contrived for the purpose of defeating the claims of the defendants against the owner of the plantation; that the crop of 1874 was made by that owner, Theodule Duplantis, and belonged to him, a portion of the advances necessary to make it having been furnished by Gaidry; that Theodule was insolvent or greatly embarrassed when the pretended lease was made by him to his brother, and was in no better condition when the brother sublet to Gaidry, and is insolvent now; and his condition was well known both to Marcel and Gaidry; that these leases had no real existence, but were simulated contrivances made by these three parties to obstruct defendants in the pursuit of one of them who was their debtor.

Before entering upon an analysis of the evidence, it will be convenient to dispose of a point made by the plaintiff and insisted on by him with pertinacity, viz.: that the defendants can not attack the lease of Gaidry from Marcel Duplantis in this manner, but are obliged to resort to a direct action to annul it, much less can they seize property claimed under that lease as Gaidry's to satisfy a judgment against another person, when the title to that property was unassailed at the time of seizure, and that the burden of proof rests upon the party charging simulation in that case. In support of this position great reliance is placed upon the case of Pierce vs. Clark, 25 An. 111, wherein the following language is used: "It is the well-settled jurisprudence of this court that the title to property can not be attacked collaterally, and that where a judgment creditor seizes property as belonging to the judgment debtor, but the title to which stands in the name of another, he assumes the burden of showing simulation."

The doctrine is stated too broadly, and requires modification. The *actio Pauliana* of the Roman law, which is our revocatory action, is to set aside contracts which have a real existence, but which the law will not permit to impede the creditor in recovering his debt, and is quite distinct from that of which the object is to have a simulated sale decreed such. A simulated transfer of property vests no right in the transferee, and is not subject to the rules of real contracts operating injuriously to creditors, who may proceed as if no such transfer had been made, and if enjoined may plead and show the simulation on the trial of the injunction. That is the doctrine enunciated in the earliest of our reports, and maintained by a long line of decisions. In one it is declared that "where the sale is purely simulated and fictitious, and when the party remains in possession, the burden of proof is upon the party claiming title to

show that the sale is *bona fide* or real." Haile vs. Brewster, 13 An. 155. It had already been held that "simulation gives neither possession nor title, and that no act of the parties to a simulated sale can be recognized as affecting the rights of creditors to the property of their debtor." Cammack vs. Watson, 1 An. 132; Hobgood vs. Brown, 2 An. 323. Again it is said: "The judgment creditor is not bound to resort to a revocatory action before seizing property which he believes to belong to his debtor, and to be held by a third person under a simulated sale." Clark vs. Bank of Alabama, 3 An. 325.

"It is the continued possession of the vendor, acting as owner after the sale, which creates the presumption of simulation and imposes upon the vendee, as regards third persons, the burden of proving the validity of the sale." Lindeman vs. Theobalds, 2 An. 912.

"The chapter of the Civil Code regulating the revocatory action is not applicable to cases of simulation. In these latter the sheriff may seize notwithstanding the apparent transfer of the property by the defendant in execution." Enswiler vs. Burnham, 6 An. 710.

"A simulated title confers no right whatever. No action is necessary to annul it." McMartens vs. Place, 8 An. 431.

And in a recent case it was held that "real property in possession of a party under a recorded title translative of property can not be seized by a judgment creditor of the former owner unless it be shown that the sale was simulated." Anderson vs. Hoy, 23 An. 175.

Several bills of exception were taken by the plaintiff to the testimony. The first to the ruling of the court permitting Theodule Duplantis to testify as to the real ownership of the property seized, the objection being that he was estopped by his " declaration that it was Gaidry's," made in his application to bond it. The law of estoppel does not apply here. A man may vary or contradict his own testimony. That will impair or destroy his credibility, but it is competent to hear it. The second bill is to the ruling of the court permitting the same party to testify as to the motives which induced him to lease his plantation to his brother, the objection being that such evidence was inadmissible until the lease was produced. The lease was introduced in evidence during the trial. It would have been more regular, however, to have laid the basis for the evidence by first offering the lease. The third bill was to the proof of declarations of Theodule Duplantis concerning the plaintiff testified to by Smith, on the ground that they were hearsay. The evidence was admissible. " Conversations or admissions of the parties implicated in the fraud or simulation may be offered by creditors, the objection to such evidence going to the effect or weight of it when the declarations are not made in the presence of the other party." Davis vs. Steon, 15 An. 177.

The defendants take a bill to the testimony of Surle, on the ground of

its irrelevancy. It was relevant as tending to show the action of Theodule, the owner, to his merchant during 1873, one of the years of the lease pretended to have been made to Marcel. "The whole tendency of modern practice is to enlarge the admissibility of evidence, leaving the court to restrict its applicability." Kaiser vs. New Orleans, 17 An. 178.

We have now to collate the oral testimony. It will be abbreviated as much as consists with a proper presentation of its material features.

The record reeks with fraud and perjury. Two brothers combine to evade the payment of a debt acknowledged, or proved to be justly due. If the testimony of the one be true, that of the other is necessarily false. The forms of law are carefully observed, behind which they attempt to hide their guilty purpose. Solemn declarations in authentic acts, and judicial admissions upon the records of courts, throw a veil over the secret intention imbedded beneath this crust of formularies. The law rends this veil asunder with its rude and unsparing hand, and beneficently throws over society its protecting shield. Simulation is difficult to be proved. They who practice it conceal their devices under the guise of acts which bear the stamp of authenticity, and have the outward appearance of fair dealing. The sinuous paths which they tread require to be illumined by the light of truth, poured upon it with merciless brilliancy. The law wisely permits great latitude in the application of the process by which this truth is to be eliminated. Conscience can be probed. The worst deformity thus exposed will revolt an individual observer, but society reaps the benefit of the detection in wrongdoing, and the law vindicates its mission.

Theodule Duplantis swears that the lease of his plantation to his brother Marcel, in February, 1873, for three years, was a "mere arrangement for convenience," and the three rent notes of two thousand dollars each were returned by him to Marcel, he not receiving, or at any time expecting to receive, any money therefor; that he has lived on the place continuously since 1861 and lives there now, and has cultivated it all the while for his own account; that the supplies and advances for the plantation during 1873 were covered by a mortgage note of his delivered to Surle, who furnished them; that when Marcel became apprehensive that his own creditors would give them trouble, he sublet to the plaintiff for 1874, and gave as a reason for it that Letchford had obtained judgment against him and might interfere with witness in the management of his affairs; that witness assented to this arrangement because it was his interest that such transfer should be made if there was a probability of Marcel's creditors interfering, provided the transfer was made on the same conditions as his lease to Marcel; i. e., without consideration and for convenience only; that the plaintiff, Gaidry, knew all this; that Marcel feared Letchford would seize the mules, and he

therefore sold them to plaintiff, who paid Marcel four hundred and twenty-five dollars cash, and then Marcel handed back the money to plaintiff in witness's presence, the intention being to simulate a sale only; that during 1874 he cultivated the plantation for himself, and the plaintiff made him part of the advances and others a part—Labat to the amount of $784 75 and LeBlanc $169—both of which sums were paid by witness with his own funds or produce; that he bought peas, corn, and fodder from nine persons whose names are mentioned by him and paid them himself, and also paid six named laborers; that part of the land worked that year, leased to Marcel and sublet to plaintiff, was held by witness under a lease from Mrs. Forest, and witness paid her the rent; that he paid the cooper, bought carts for the place, and paid for one and is to pay for the other, killed his own beeves for the laborers, and in all respects acted as owner, both of land and crop, which were his own; that he marked the sugar and molasses seized with plaintiff's initials, because he intended it should be shipped by him and the net proceeds applied to the payment of plaintiff's account against him for supplies ; that this produce was in witness's possession at the time of seizure; other barrels and hogsheads were marked with names of other persons for whom those were intended in like manner as those marked for plaintiff; some of the Gaidry marks were effaced, and the barrels, etc., were re-marked in Daspit's name and others, and these changes were reported to plaintiff and approved by him.  He denies that he engaged to serve as overseer for plaintiff, and explicitly confesses that his disclaimer of ownership of the produce, made in the application to bond it, was false.  His plantation is now under seizure by Lapène & Ferré to satisfy the mortgage of 1870.

Labat confirms the statement relative to the supplies furnished by him to Theodule Duplantis and the payment of the account by the latter, and LeBlanc does likewise.  LeBlanc lives in the neighborhood, and had accounts against some of the laborers, which Theodule told him to transfer to his account, and he paid it; but this payment was made in part by drafts on plaintiff.  Lecompte, Ozio, Hebert, and Forest all sold forage to Theodule that year and were paid by him.  The last mentioned knows that Theodule paid the rent money to Mrs. Forest, as narrated by him.  Some of the laborers testify they were employed and paid by Theodule.  In June, 1874, Smith was at the latter's residence on the plantation and was shown by him an account of the plaintiff's for supplies, and he complained of plaintiff's exorbitant charges for oats, flour, etc., and declared he would not submit to such prices, and would cut grass and cure it and thus save expenses for forage, and other witnesses say that he did as he then declared he would do.

Marcel Duplantis swears, on the other hand, that his lease from his

brother and his sublease to plaintiff were genuine, and that the price
of the latter was paid to him by plaintiff; that the purpose of the par-
ties was to deposit the three rent notes of two thousand dollars each
with Surle as collaterals for advances, but that it was not done, and
himself made the advances; that the expenses of 1873 were seventy-five
hundred dollars, of which Surle furnished twenty-five hundred dollars,
and witness used his own money for the residue, and that he received
twenty-eight hundred dollars, of which plaintiff paid him eight hun-
dred dollars, and the balance was the proceeds of the sale of mules and
carts. "Upon his soul and conscience," he exclaims, " he is sure the
sugar and molasses ought to belong to Gaidry " (plaintiff), and immedi-
ately adds, " he may, perhaps, be deceived." He swears that his
brother Theodule engaged to serve as overseer to plaintiff as vehemently
as the other swears to the contrary, and fixes the time of that engage-
ment at May, 1874. He had transactions with plaintiff during that year
amounting to $1300 or $1400, and on being asked why he did not pay this
indebtedness in part with plaintiff's rent note answers, " c'etait mon
affaire "—he has always thought plaintiff an honorable man, and never
warned his brother Theodule to be on his guard against him. Then,
being shown a letter, says it was written by himself. This letter is ad-
dressed to his brother, and is dated the ninth of January, 1874, two
weeks after his lease to Gaidry. After informing him that he had writ-
ten him two letters since yesterday the letter proceeds : " Vient, comme
je te dis, soit 'sure de toute arrangement, mais comme je vois tous se
trouver postiche suivant ce que j'aurais à te dire. Tu as le temps, je
pense; vient, et de là tu pouvais voir avec ce que je te dirais; ne te fie pas
à Louis Surle, ni même Adolphe dans rien. C'est pourquoi je t'écris
ainsi. Je pense que cela suffit pour que tu save à quoi t'en tenir.

          "Tout à toi,                              M. DUPLANTIS.

    " P. S. A. G. m'a dit, hier, qui fallait je lui trouve l'argent."

    Then being questioned as to whom he referred by the initials A. G., he
does not recollect. Questioned further as to whom he referred by the
name Adolphe, he does not know. Then immediately after he says A.
G. and Adolphe refer to the same person, but does not designate the
person.

    Clay Duplantis, a nephew and employee of the plaintiff, testifies to an
arrangement between Theodule Duplantis and the plaintiff, by which the
former was to become the overseer of the latter at one hundred and fifty
dollars per month till October of 1874, but on plaintiff during the con-
versation objecting to the salary Theodule agreed to take his pay out of
the profits after all expenses were paid.

    Justin Daspit, a brother-in-law of plaintiff, gives much the same
testimony.

Surle advanced for the cultivation of the crop of 1873, to secure payment of which Theodule deposited with him mortgage notes for six thousand dollars as collateral.

Last we will epitomize the testimony of Gaidry, the plaintiff. He was in possession of the plantation from the moment of Marcel's lease to him, and made the crop of 1874; the advances to make the crop were made by him; Theodule was his manager; paid Marcel eight hundred dollars, the consideration of his lease, and two thousand dollars cash for mules and agricultural implements; don't know how much his lessor was to pay for his lease from Theodule, nor how many hands worked on the place; didn't know the crop was liable to seizure by Marcel's lessor; sent all supplies and moneys from his store, twenty miles distant; there was no agreement with Theodule about salary, which was entirely left to witness; Theodule came to him to be employed as overseer about February, 1874.

Groping through this mass of contradictions and prevarications we find certain salient facts established. Theodule Duplantis was insolvent at the time of the lease from him to his brother Marcel, and the subsequent sublease to their cousin, Adolphe Gaidry, and the seizure of the produce by Lapène & Ferré. The mortgage of 1870 to these last is unpaid, and his plantation is now under seizure for its satisfaction. The judgment in his wife's favor in May, 1874, could only have been rendered on proof of the derangement of his affairs. The suit of Lapène & Ferré in January, 1873, was for the recovery of another debt in addition to that secured by mortgage. Scarcely had the sheriff served the process in this suit upon Theodule Duplantis when he makes a lease for three years to Marcel, for which no consideration was ever paid. This lease was a simulation, and was not intended by either of the parties to have a real existence, but was expressly designed to obstruct the creditors of the lessor in the prosecution of their claims. The customary suit of the wife followed in quick succession. Before the expiration of the first year Marcel needed the same protection from his own creditors, and his lease to the plaintiff had the same purpose as the other, and like it was a simulation. The continued possession of the debtor of the property, his management and control of it, his payment of many of the expenses incurred in its cultivation with his own funds, or the produce he raised, and the pledge of his mortgage notes as collaterals to the merchant who supplied and advanced him for the crop of 1873, and his purchase of some of the supplies from the plaintiff for that of 1874, and his complaints of the prices charged are circumstances that show the character of the arrangement, and its purpose. Undoubtedly the plaintiff furnished a considerable part of the supplies and advances for the crop of 1874. Were he before us prosecuting a

demand for their payment with a recorded privilege, he would doubt-less have established his right to a judgment in his capacity of furnisher of supplies. He has chosen a different course. Relying upon a simu-lated lease, he claims the produce as owner, and imagined that authentic acts, containing illegal and fraudulent combinations to defraud credit-ors, could not be torn to shreds by the sharp talons of the law, when it scents fraud and deceitful devices.

The judge who tried the case evinces in an elaborate and well-con-sidered opinion his patient and careful examination of the whole evi-dence, and the law applicable to it. He has rightly interpreted the one, and has duly weighed the other. He had the witnesses before him, and saw the manner of giving their testimony. His judgment was that plaintiff's injunction be dissolved with twenty per centum upon the amount enjoined, as general damages, and three hundred dollars attor-ney's fee as special damages, decreeing the produce seized to be the property of Theodule Duplantis, the judgment debtor, and subject to the execution of Lapène & Ferré, the judgment creditor, and annulling the several leases, and declaring them to be simulations.

The judgment is just.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be and it is hereby affirmed with costs of both courts.

---

### On Rehearing.

DeBlanc, J. Adolphe Gaidry prays for a rehearing of this case on the grounds:

First—That, as his title springs from a recorded lease, it can be as-sailed only by a direct action.

Second—The testimony of Surle and Daspit has a tendency to create a doubt as to the simulated character of the transaction between him and Duplantis, and that doubt should be construed in favor of honesty and fair dealing.

Third—That with no degree of certainty has any fraudulent intent been traced to him in the matter of that lease.

We have carefully re-examined this case and our decree; we have once more read and considered the evidence and the law, and our former opinion stands unremoved, unshaken. Of the grounds urged by plaintiff not one is supported by either evidence, law, equity, or the authorities on which he relies.

. The obvious distinction between a revocable and a simulated contract has been for upward of fifty years recognized in our jurisprudence, and applied by the tribunals of the State. To revoke a real contract, how-ever illegal it may be, one must proceed by a direct action; and why?

Because such a contract does exist, and can not be treated and set aside as an absolute nullity. That which has but the empty form and not. the substance of a contract—that which never had any real and legal existence—is, and may be declared a nullity, either in a direct action or otherwise. H. D., p. 1031, No. 1.

In this case, what is the salient fact? Adolphe Gaidry willingly and knowingly became an accomplice—not in a mere act of preference in favor of a favorite creditor—but in a gross, unjustifiable, and ill-disguised fraud, in a bold and manifest simulation. The transparent veil thrown over it has been raised by their own hands, and we are told that in this instance, in this action, we are without authority to check its course, and to defeat its purpose.

Our mission is not to excuse or encourage fraud, but to eradicate and discourage it, and little do we care that the act which conceals it bears. the signature of a public officer, and that it was recorded. We would be guilty of a strange breach of our trust if we did not dare look behind the signature and the certificate of an officer, to detect and strike down a fraud and a simulation.

Gaidry now appeals to us to mitigate what he calls his loss, by reversing that part of the decree of the lower court awarding damages against him. This we are not inclined to do. As to him—to his claim for advances—no fraud was necessary. He chose to coalesce with dishonest debtors, and to link his claim with dishonest pretensions, and he suffers. by his own fault—his indisputable complicity.

The rehearing is refused.